THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: June 29, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*UVeritech, Inc.*
*v.*
*Amax Lighting, Inc.*

_____

Cancellation No. 92057088

_____

UVeritech, Inc., *pro se*.

Jen-Feng Lee and Kenneth Tanji, Jr. of LT Pacific Law Group LLP for Amax Lighting, Inc.

_____

Before Quinn, Mermelstein and Bergsman, Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

The parties in this case used to have a business relationship. Now the only thing they have in common is that each believes it owns the mark UVF861, which was used on a product that was the subject of their former business relationship.

UVeritech, Inc. ("Petitioner"), doing business as Fraud Fighter, filed a petition for cancellation of Amax Lighting, Inc.'s ("Respondent") registration of the mark UVF861 (in standard characters) for "lighting fixtures, light bulbs, and internal lighting in the nature of lighting tracks and lighting tubes" in

International Class 11.[1] As grounds for cancellation, Petitioner alleges that Respondent's mark, when used in connection with Respondent's goods, so resembles Petitioner's previously used identical mark UVF861 for a "replacement bulb part" for Petitioner's "ultraviolet counterfeit currency detection equipment," as to be likely to cause confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d).

Respondent, in its answer, denied the salient allegations of likelihood of confusion. Respondent further alleges that it has prior use of the mark.

The record consists of the pleadings; the file of the registration sought to be cancelled; trial testimony,[2] with related exhibits, taken by both parties;[3] and a Fed. R. Civ. P. 30(b)(6) discovery deposition of Petitioner taken by Respondent,

---

[1] Registration No. 4252740, issued December 4, 2012.

[2] The record includes two trial testimony depositions of Michael Chen, one located at 7 TTABVUE (taken by Petitioner) and the other at 11 TTABVUE (taken by Respondent). The depositions of both Mr. Chen and Ms. Chen were facilitated by the use of a Mandarin interpreter. Citations to the record in this opinion are to the TTABVUE docket entry number and the electronic page number where the document or testimony appears. Because the Board primarily uses TTABVUE in reviewing evidence, the Board prefers that citations to material or testimony in the record that has not been designated confidential include the TTABVUE docket entry number and the TTABVUE page number. For material or testimony that has been designated "confidential" and which does not appear on TTABVUE, the TTABVUE docket entry number where such material or testimony is located should be included in any citation. *See Turdin v. Trilobite, Ltd.*, 109 USPQ2d 1473, 1476 n.6 (TTAB 2014).

[3] During the testimony depositions of Petitioner's witnesses, Respondent raised several objections, including that certain documents introduced at trial were not produced during discovery. Respondent did not maintain any of the objections in its brief and, accordingly, the objections are deemed waived. *See General Mills Inc. v. Fage Dairy Processing Industry SA*, 100 USPQ2d 1584, 1592 n.7 (TTAB 2011).

2

introduced by way of Respondent's notice of reliance.[4] Both parties filed briefs on the case.

*Preliminary Issue*

Before turning to the merits of this proceeding, we direct our attention to issues raised for the first time by Petitioner in its brief. As indicated above, the only ground pleaded in the petition to cancel is likelihood of confusion. However, in its brief, Petitioner also sets forth "Alternative Causes of Judgment In Favor Of Petitioner." (9 TTABVUE 14-16). More specifically, Petitioner raises for the first time allegations relating to fraud, acquiescence and laches.[5] Respondent, in its brief, expresses its surprise, pointing out that the additional purported claims were not pleaded and, thus, there was no discovery or a trial on these issues.

---

[4] Respondent introduced the entire discovery deposition as permitted under Trademark Rule 2.120(j). However, in order to avoid creating an overly large record of irrelevant evidence, and to more effectively focus the Board's attention on the critical evidence, parties should file only those portions of a discovery deposition transcript that are relevant to the pleaded claims. *Sports Authority Michigan Inc. v. PC Authority Inc.*, 63 USPQ2d 1782, 1787 (TTAB 2001) ("[E]ach party has submitted discovery deposition transcripts in toto, i.e., has made no apparent effort to identify and introduce only those portions that are relevant to our determination of the pleaded claims. While not improper, it is more effective to file only those portions that are relevant and explain their relevancy in the notice of reliance"). *See* TBMP § 704.09 (2014). *See also* TBMP § 702.05.

[5] Petitioner asserts that "Respondent's actions over the span of more than 8 years by failing to ever mention any claim to the rights of the disputed trademark constitutes a clear and obvious example of acquiescence" and that "Petitioner relied on this acquiescence as the basis from which it willingly and overtly invested much time, money and effort into the development of the sales into the marketplace and the goodwill associated with the trademark." As to laches, Petitioner alleges that "the approximately eight-and-one-half year delay between the alleged date of first use of the mark by Respondent (Feb. 7, 2003) and the date of application for registration of the mark (Oct. 21, 2011) constitutes unreasonable delay in the claim to trademark rights in the disputed mark" and that "at no time during this period did Respondent notify Petitioner of any claims to trademark rights in the mark, even after Respondent became aware that Petitioner had moved its manufacturing of the goods utilizing the mark to another supplier." (9 TTABVUE 15-16).

The allegations relating to fraud, acquiescence and laches will not be heard. First, fraud was neither pleaded in the petition to cancel nor tried by implied consent. *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1103 n.3 (TTAB 2007) (raising claim for first time in plaintiff's brief is manifestly untimely; belated fraud claim given no further consideration). *See* TBMP § 314. Second, acquiescence and laches are affirmative defenses that may be raised by a defendant, not claims asserted by a plaintiff. *See* TBMP § 311.02(b). *See also* Trademark Rule 2.114(b)(1).

Although this proceeding was brought on the ground of likelihood of confusion, the actual issue in this case is ownership of the mark UVF861 for light bulbs. Petitioner, in its brief, states: "It is ownership of the mark, UVF861, which is under dispute in the present matter before the Board." (9 TTABVUE 6). Respondent, in its brief, indicates that the issues are the following: "1) Did Petitioner overcome the presumption of validity and ownership of a registered mark; and 2) Did Petition [sic] meet its burden of overcoming the manufacture-distributor [sic] presumption of trademark ownership?" (10 TTABVUE 5).

It is clear that Respondent had fair notice that Petitioner intended to focus on the issue of ownership, and also actively defended against it on the merits, and now, like Petitioner, frames this as an ownership dispute. *Conolty v. Conolty O'Connor NYC LLC*, 111 USPQ2d 1302, 1304-05 (TTAB 2014) (citing *Nahshin v. Product Source Int'l LLC*, 107 USPQ2d 1257, 1258 (TTAB 2013)). In other words, the parties tried the issue of ownership and they argued the issue in their briefs. *See P.A.B. Produits et Appareils de Beaute v. Satinine Societa In Nome Collettivo di S.A. e.M.*

*Usellini*, 570 F.2d 328, 196 USPQ 801, 804 (CCPA 1978) ("Normally, if evidence were submitted on an issue without objection by registrant, and both sides presented arguments thereon, then, in accordance with Fed. R. Civ. P. 15(b), the Petition for Cancellation would be treated as amended to conform to the evidence."). S*ee also Colony Foods, Inc. v. Sagemark, Ltd.*, 735 F.2d 1336, 222 USPQ 185, 187 (Fed. Cir. 1984); *Kasco Corp. v. Southern Saw Service Inc.*, 27 USPQ2d 1501, 1504 (TTAB 1993), and cases cited therein. We may either treat the pleadings as amended pursuant to Fed. R. Civ. P. 15(b) to include as a ground Respondent's lack of ownership of the registered mark,[6] as we did in *Nahshin*, 107 USPQ2d at 1258, or construe the parties' characterization of the claim as an ownership dispute to be simply a focus on the element of ownership inherent in every *inter partes* proceeding under Section 2(d).[7] In any case, when the parties are claiming rights in the same

---

[6] Of course if Respondent was not the owner of the mark when application was made for registration, then the registration is void *ab initio*. *See* Section 1(a)(1) of the Trademark Act, 15 U.S.C. § 1051(a)(1) (providing that "the owner of a trademark used in commerce may request registration of its trademark").

[7] A proprietary interest in a mark is a necessary element in any *inter partes* proceeding under Section 2(d). Section 2(d) challenges may be based either on ownership of a registered mark (which is not implicated here) or prior use of an identical or similar mark. *See, e.g.*, *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1378 (Fed. Cir. 2002) ("[A] party petitioning for cancellation under section 2(d) must show that it had priority and that registration of the mark creates a likelihood of confusion. . . . To establish priority, the petitioner must show proprietary rights in the mark that produce a likelihood of confusion.") (citation omitted); *T.A.B. Sys. v. Pactel Teletrac*, 77 F.3d 1372, 37 USPQ2d 1879, 1881 (Fed. Cir. 1996) ("In an opposition founded on section 2(d), the opposer must establish its own prior proprietary rights in the same or a confusingly similar designation in order to defeat the application."); *Land-O-Nod Co. v. Paulison*, 220 USPQ 61, 65 (TTAB 1983) ("One who opposes registration to an applicant under Section 2(d) . . . must prove that he has proprietary rights in the term he relies upon to demonstrate likelihood of confusion as to source, whether by ownership of a registration, prior use of a technical 'trademark,' prior use in advertising, prior use as a trade name, or whatever other type of use may have developed a trade identity.") (citation and internal quotation marks omitted); *see also*

mark for the same goods, likelihood of confusion is inevitable.[8] Moreover, when both parties are relying upon activities the two conducted in concert with one another, each in an attempt to establish prior rights in a mark over the other, the dispute centers on ownership of the mark. *See id.* ("Although the proceeding was brought on the ground of priority/likelihood of confusion, the actual issue in this matter is ownership of the mark NIC-OUT/NIC OUT in the United States, as the cigarette filters that respondent sells under the mark NIC OUT are the same filters that petitioner arranged to have manufactured under the mark NIC-OUT.").

We therefore focus our discussion on who owns the mark UVF861. It is Petitioner's burden as plaintiff in the proceeding to establish prior ownership by a preponderance of the evidence. *See, e.g., Metro Traffic Control, Inc. v. Shadow Network Inc.*, 104 F.3d 336, 41 USPQ2d 1369, 1372 (Fed. Cir. 1997).

### *Standing*

The dispute over ownership of the mark also establishes standing. Standing is a threshold issue that must be proved in every *inter partes* case. *Lipton*

---

*Person's Co. v. Christman*, 900 F.2d 1565, 14 USPQ2d 1477, 1479 (Fed. Cir. 1990) (use of a trademark is what gives rise to ownership rights).

[8] In this connection we also note Petitioner's now-abandoned application Serial No. 85811249 to register the mark UVF-861 (with a hyphen) for "counterfeit money detection light to be used in retail stores and banks" in Class 9, and "fluorescent lamp tubes" in Class 11. The Office refused registration under Section 2(d) on the basis of Respondent's registration now sought to be cancelled. The application was abandoned due to Petitioner's failure to timely respond to an Office action. (Trundy dep., Ex. 1; 8 TTABVUE 49). Throughout the testimony, evidence and briefs, the mark at issue is referred to interchangeably as both UVF861 (the registered mark without a hyphen) and UVF-861 (with a hyphen, and the subject of Petitioner's application). For ease of reference within this decision, we refer to the disputed mark as it is reflected in the registration, namely UVF861.

*Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). In order to satisfy the standing requirement, a plaintiff need only show that it has a real interest, that is, a personal stake in the outcome of the proceeding. *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1026 (Fed. Cir. 1999). The testimony of Arthur Michie, founder and owner of Petitioner, and Sean Trundy, Petitioner's chief operating officer, together with the related exhibits, establish Petitioner's standing. More specifically, Messrs. Michie and Trundy testified about Petitioner's use of the mark UVF861 in connection with bulbs for Petitioner's ultraviolet counterfeit currency detection equipment. Moreover, Respondent did not dispute Petitioner's standing to bring this cancellation proceeding.

### *Facts*

In trying to determine which party is entitled to claim ownership of the mark, we observe at the outset that the record is hardly a model of clarity. The parties dispute each other's account of certain relevant facts, so we have made liberal use of quotes from the testimony. There is no written agreement between the parties covering the trademark at issue, and their testimony demonstrates a fundamental difference in expectations regarding each other during their business relationship. Mr. Michie, when asked if there was a written agreement between Petitioner and Respondent regarding their relationship, responded:

> I used to think that I could judge people and make good
> relationships and not have to have things on paper all the
> time, and, no, I was quite naïve, and I didn't.
> (Michie dep., 7 TTABVUE 23)

Mr. Michie indicated, however, that the parties had an oral agreement. When asked about his understanding of the oral agreement, Mr. Michie responded:

> Probably a thousand different conversations over ten years. If they had been recorded, it would make it quite obvious where the ownership of that product [bulbs] was.
> (Michie dep., 7 TTABVUE 33)

> [Respondent] has always been aware that this was our product. We asked them to make this for us, and the fact is – my understanding is that, and I think they would be aware of that, that when a product is out in the marketplace and it's been advertised as your product and given a model number over a fairly significant period of time, as our product has, that by definition, we have a trademark with it.
> (Michie dep., 7 TTABVUE 34)

Julia and Michael Chen are husband and wife; Ms. Chen is the owner of Respondent and Mr. Chen offers "purchasing" and tech support for Respondent. Mr. Chen confirmed the absence of a written agreement, but disputed that there was an oral agreement between the parties regarding the mark UVF861. (M. Chen dep., 11 TTABVUE 18).

In the absence of an agreement concerning the mark, we must understand the nature and history of the parties' business dealings, and how they went from business partners to adversaries in this litigation.

Petitioner is engaged in the loss protection industry; more specifically, Petitioner sells devices to detect counterfeit currency and to validate credit cards and driver's licenses. The devices are sold under the mark FRAUD FIGHTER. The devices use UV (ultraviolet) bulbs to detect counterfeit money and the like.

8

Respondent is the latest entity in what Mr. Chen characterizes as a "series of entities," all owned by Ms. Chen, comprising America Elex, Amex Lighting and now Respondent, Amax Lighting. (M. Chen dep., 11 TTABVUE 10).[9] All of these entities made bulbs for Petitioner's devices at some point.

When Petitioner began its business in 2001, it originally sourced its "ultraviolet light fixtures" (which are the counterfeit detector and currency validator devices) from Lightway Industries, an unrelated third party located in California; the fixtures were identified as Models UV-8 and POS15. Petitioner also purchased the bulbs for the fixtures from Lightway. The bulbs were identified as UVF-461 (a 4-watt replacement bulb). (Michie dep., Ex. 1; 7 TTABVUE 7-10). With respect to the UVF-461 bulb, Petitioner testified:

> So I called it UV-461 [sic] because it basically was a 4-watt bulb that was going to hopefully produce maybe as much as 6 watts, and it was the first iteration of that bulb, and it's "UV," of course, because it's ultraviolet, or for "UVeritech," and "F" for "fluorescent" because, again, I didn't want other folks to be able to supply our bulb. That's why we gave it a different name and, uh, different specifications.
> (Michie dep., 7 TTABVUE 11-12)

Petitioner then sought to lower its costs for the UVF-461 bulbs, and its search led it to Respondent (America Elex) in 2001. At that time, Respondent was making F4T5BLB bulbs, the industry generic model number used for the type of 4-watt bulbs (UVF-461) used in Petitioner's UV-8 and POS15 products. An invoice describes this bulb as a "4W 6" black light blue fluore." (Michie dep., Ex. 3; 7

---

[9] For ease of discussion within this decision, and given the common ownership thereof, we refer to the "series of entities" as "Respondent."

9

TTABVUE 60). Petitioner began to purchase the bulbs from Respondent, selling them to purchasers under the mark UVF-461.

Mr. Chen approached Mr. Michie in mid-2002, proposing that Respondent also take on the manufacture of Model UV-8 in China, in addition to the bulbs it was already making for Petitioner. Respondent offered to make Model UV-8 at a lower price than Petitioner was paying to have the product made in the United States. The UV-8 product used two UVF-461 bulbs for a combined total of 8 watts of UV light. (Michie dep., 7 TTABVUE 16).

> Well, the logic of the situation is he [Mr. Chen] came into our office and wanted to produce a product we already had, and then we were charged and paid fees for tooling, for the process of having the product UL approved. So these are not things that you do that – when if you're buying a product from somebody. This was an OEM relationship.
> (Michie dep., 7 TTABVUE 24)

In response to direct questions, Mr. Michie confirmed that Petitioner paid for tooling and the UL (Underwriters Laboratories) listing fees for Respondent's production of the UV-8 fixture.

> Because before producing the product, the factory had no tools that would allow them to make it, so that, therefore, [Petitioner paid] the fee to produce the tools to make the product that we were asking them to make. We owned the tools; therefore, we owned the product.
> (*Id.*)

When the manufacturing of the UV-8 fixture and the UVF-461 bulbs shifted from Lightway in California to Respondent in China, Petitioner wanted to alter the light fixtures to allow the use of larger, more powerful bulbs; this new bulb would

produce 8 watts, twice the wattage of the UVF-461 bulbs, which produced 4-watts of

power. Petitioner viewed the new bulbs as 8-watt bulbs:

> I wanted, again, to – to be able to say that the units that
> we were providing – were more powerful than anything
> else that's available, and so I thought perhaps I – I asked
> Michael if we could produce 8 watts – an 8-watt bulb of
> the same size that could fit the same unit, the UV-8, and
> that's how we – we came up with the UVF861 number
> because it was an 8-watt bulb, and previously, we'd used
> 461, so this now just naturally followed on to be 861.
>
> I asked Michael if he could produce an 8-watt bulb, and
> he came back at some point later and said yes, he could,
> and I told him that it needed to be the same size to fit – to
> fit the same unit but be different from whatever else.
> (Michie dep., 7 TTABVUE 16-17)

Respondent then began making the new 8-watt UVF861 bulbs for Petitioner in

February 2003, as well as the new Model UV-16 light fixture. (M. Chen Ex. 2; 11

TTABVUE 33). Respondent did not manufacture the bulbs itself, but rather sourced

the bulbs from an unrelated entity in China, Jing Yuan Chang Hong. (M. Chen dep.,

7 TTABVUE 115-118). When asked "who came up with the part number UVF861,

Mr. Michie responded "I did." (Michie dep., 7 TTABVUE 17).

This arrangement continued for four years, apparently to both parties'

satisfaction. The situation changed in 2007, at a time of steadily increasing quality

issues with the Model UV-16 light fixture and the UVF861 bulbs. Mr. Michie

testified that the bulbs produced by Respondent were "defective," producing only 5.5

watts rather than at least 8-watts. (Michie dep., 7 TTABVUE 18). Petitioner had an

existing relationship with another factory in China named Li-Tek Corporation, and

in 2007, Petitioner transferred its business to this factory to produce the UVF861

bulbs, and UV-16 and POS15 light fixtures. (Michie dep., 7 TTABVUE 20-21; Michie dep., Ex. 5; 7 TTABVUE 63). During the period of Li-Tek's production of the UVF861 bulb for Petitioner, Mr. Michie testified that although Respondent was aware of the production of UVF861 branded bulbs by this third party for Petitioner, the Chens did not mention any trademark infringement by Petitioner stemming from Petitioner's use of the designation UVF861 on those bulbs. (Michie dep., 7 TTABVUE 21-22).

In short order, however, Petitioner had similar quality problems with the products produced by Li-Tek:

> Uh, we had quality issues there also, and Michael Chen had been talking – continued talking to us on an ongoing basis about wanting to continue to – to have our business, and so allowing for the fact that we had – we had problems with Li-Tek, we – decided to give I think it was still America Elex another chance, and we – we allowed them to start producing our product again.
> (Michie dep., 7 TTABVUE 21).

As a result, Petitioner agreed to return its business to Respondent to make the UVF861 bulbs, and UV-16 and POS15 light fixtures. (M. Chen dep., 7 TTABVUE 120-122).

Mr. Michie went on to explain that Petitioner's business relationship with Respondent began to deteriorate again in 2011 when Petitioner supplied product to fill "a very large order from a large national drugstore chain" for 12,000 UV-16 light fixtures, and 20,000 UVF861 bulbs.

> We no sooner started delivering the units than we were getting calls that the units were popping and smoke was

12

coming out of them. It became like an epidemic of calls.
(Michie dep., 7 TTABVUE 19)

Mr. Trundy testified that the bulbs "had experienced approximately a 70 percent failure rate." (Trundy dep., 8 TTABVUE 33).

Mr. Michie informed Respondent of the quality problems, seeking an explanation to figure out what was taking place and to address the issue of managing the return of thousands of defective bulbs. Messrs. Michie and Trundy travelled to Shanghai, China to personally meet with Mr. Chen on September 22, 2011 "to try and resolve the issue and come up with solutions." (Michie dep., 7 TTABVUE 30). Specifically, Mr. Michie stated that "it was a huge financial issue for us and that the units had to be replaced," so he "was looking for the factory to be responsible and take care of the replacement costs." (Michie dep., 7 TTABVUE 30). According to Mr. Trundy, "we had our single largest customer, you know, just called us and told us that we were in big trouble." (Trundy dep., 8 TTABVUE 35). Mr. Trundy recalls the meeting:

> When we approached [Respondent] to have them, you know, step up and help us out to replace the products – we weren't even asking them to do it for free, we were willing to pay – and not only did they demand that any replacement product be purchased for [sic] them would be at the full price, but in fact they raised our price to replace products that they had produced, faulty products that they had produced. They were going to charge us more than what we had initially paid for the product. So at that point, our decision was that this was not a business partner we could move forward with.
> (Trundy dep., 8 TTABVUE 33-34).

13

Mr. Michie learned that Respondent was having the bulbs made by someone else, a situation he found "unfortunate." According to Mr. Michie, Mr. Chen disavowed any responsibility for the problem. (Michie dep., 7 TTABVUE 31-32).[10] No resolution was reached, with Mr. Michie recalling that "it was rather obvious based on Mr. Chen's conversation that the relationship was over." (Michie dep., 7 TTABVUE 49).

It was about a month after the meeting in China that Respondent, without Petitioner's knowledge, filed its application to register the mark UVF861. Registration eventually issued to Respondent. Petitioner first learned of Respondent's registration when Petitioner's subsequent application to register the mark UVF-861 (Application Serial No. 85811249), filed December 27, 2012, was refused registration on April 17, 2013 under Section 2(d) on the basis of Respondent's registration. Petitioner then decided to suspend its use of the mark "due to unclarity over the ownership." (Trundy dep., 8 TTABVUE 24). The following notice appeared on Petitioner's website: "Some vendors unauthorized by Fraud Fighter are selling the previous part number UVF861. This part has been discontinued and is no longer a valid replacement part. Use of ... the UVF861 bulbs from unauthorized dealers will invalidate the warranty on your machine and could be hazardous." (Trundy dep., Ex. 8; 8 TTABVUE 29).

Mr. Michie contends that Petitioner had an "original equipment manufacturer" relationship with Respondent, inasmuch as Petitioner approached "a

---

[10] The evidence of record discloses that Respondent, over the years of its relationship with Petitioner, sourced the production of the bulbs to a variety of entities in China. The entities were Shanghai Foreign Trade (M. Chen dep., 7 TTABVUE 116); Rite Lite, Inc. (M. Chen dep., 7 TTABVUE 110); and Jing Yuan Chang Hong (M. Chen dep., 7 TTABVUE 117).

14

factory and ask[ed] them to produce a product that is [our] design." (Michie dep., 7 TTABVUE 23). In Mr. Trundy's view, Respondent was a "contract manufacturer" for Petitioner. (Trundy dep., 8 TTABVUE 15). According to Mr. Michie, the Chens contributed "nothing" to the adoption and use of the mark UVF861. (Michie dep., 7 TTABVUE 40). Mr. Trundy testified that Petitioner "came up with the UVF861 trademark. [Petitioner] told [Respondent] to put that trademark on the product [Respondent] was going to contract and manufacture for [Petitioner]." (Trundy dep., 8 TTABVUE 32-33).

Mr. Michie also testified that Petitioner had "proprietary designs" to the UVF861 bulb:

> The product that Mr. Chen and his entities manufactured for us [was] designed by UVeritech. That was the first product of its kind that had two bulbs in such a small unit, and we produced drawings and designs, and the prototypes were given to Mr. Chen and his entities to produce a like unit for us, and we controlled the specifications of those units.
> (Michie dep., 7 TTABVUE 42)

The same types of specifications were given to Lightway when that entity originally made bulbs for Petitioner. Mr. Michie maintains that Petitioner always had quality control over the product through testing. (Michie dep., 7 TTABVUE 44).

The Chens have offered their own version of certain facts relating to the relationship with Petitioner and their alleged ownership of the UVF861 mark. When asked "who came up with that mark UVF861," Mr. Chen replied "It's me," and indicated that he instructed the factory in China to put the trademark on the product to be shipped to the United States. (M. Chen dep., 11 TTABVUE 17). Mr.

Chen stated that he determined that the bulbs should be labeled with UVF861: "It was according to the – the light – the light profession. I did it according to my – the knowledge of making light bulbs." (M. Chen, 7 TTABVUE 119). Thus, according to Mr. Chen, Petitioner is a "distributor/purchaser" of the products, while Respondent is the "manufacturer." (M. Chen dep., 11 TTABVUE 18). When asked whose idea it was to file a trademark application to register UVF861, Mr. Chen replied: "Because I created it, I invented it, and so [Respondent], my wife went and applied for it." (M. Chen dep., 7 TTABVUE 122). Ms. Chen testified, however, that prior to conducting business with Petitioner, Respondent never sold a product under the mark UVF861. (J. Chen dep., 7 TTABVUE 74).

*Analysis*

"The owner of a trademark used in commerce may request registration of its trademark... ." Section 1 of the Trademark Act, 15 U.S.C. § 1051. *See In re Wella A.G.,* 787 F.2d 1549, 229 USPQ 274, 277 (Fed. Cir. 1986) (C.J. Nies concurring) ("Under section 1 of the Lanham Act, only the *owner* of a mark is entitled to apply for registration.") (emphasis in original); *Great Seats Ltd. v. Great Seats Inc.*, 84 USPQ2d 1235, 1239 (TTAB 2007).

Petitioner's principal argument is that Respondent manufactured goods to Petitioner's order and specifications and, thus, Petitioner owned the mark applied to the goods.

As indicated above, Respondent's principal argument is that it is the owner of the mark because it is the foreign manufacturer of the goods, while Petitioner is merely the U.S. distributor.

The Board stated in *Lutz Superdyne, Inc. v. Arthur Brown & Bro., Inc.*, 221 USPQ 354, 362 (TTAB 1984):

> [I]t has been held that the question of ownership of a mark as between the manufacture[r] of the product to which the mark is applied and the exclusive distributor of the product is a matter of agreement between them, and that in the absence of an agreement, there is a legal presumption that the manufacturer is the owner of the mark. *See: Far-Best Corporation v. Die Casting "1D" Corporation*, 165 USPQ 277 (TTAB 1970), and *Audioson Vertreibs-GmbH v. Kirksaeter Audiosonics, Inc.*, 196 USPQ 453 (TTAB 1977).

*See Global Maschinen Gmbh Banking Systems, Inc.*, 227 USPQ 862 (TTAB 1985).

The presumption that the manufacturer is the owner of a disputed mark may be rebutted. *See, e.g., Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 40 USPQ2d 1149, 1152 (9th Cir. 1996), *modified on other grounds*, 97 F.3d 1460 (9th Cir. 1996). In such circumstances, courts have looked to various factors when determining which party has the superior right of ownership. *See, e.g., id.* at 1151-52 ("[T]he ownership of the mark turns on which party was the initial owner … . The determinative issue is not which label is placed upon the relationship, but rather which party can establish priority of ownership."); *Wrist-Rocket Mfg. Co. v. Saunders*, 379 F. Supp. 902, 183 USPQ 17 (D. Neb. 1974), *aff'd in part and rev'd in part*, 516 F.2d 846, 186 USPQ 5 (8th Cir. 1975).

17

In order to resolve the prototypical dispute over the ownership of a single, indivisible trademark when there is a neglect of formalities in defining the business relationship between parties, we find the similar factual frameworks adopted by the courts in *Sengoku Works* and *Wrist-Rocket* instructive. These courts looked to several relevant factors, including the following:

> (1) which party created and first affixed the mark to the product;
>
> (2) which party's name appeared with the trademark on packaging and promotional materials;
>
> (3)  which party maintained the quality and uniformity of the product, including technical changes;
>
> (4) which party does the consuming public believe stands behind the product, *e.g.*, to whom customers direct complaints and turn to for correction of defective products;
>
> (5) which party paid for advertising; and
>
> (6) what a party represents to others about the source or origin of the product.

No one factor is dispositive. Further, as in the present case, the fact that one party may own a federal trademark registration must be considered within this factual context; if the registrant was not the owner of the mark in the first place, the registration is void *ab initio*. Sections 33(a) and 33(b) of the Trademark Act, 15 U.S.C. §§ 1115(a) and 1115(b); s*ee, e.g., Ilpack Research & Dev. S.A. v. Record SpA*, 762 F. Supp. 1318, 1322 (N.D. Ill. 1991) (noting that registration is only a presumption of ownership); *General Bus. Serv., Inc. v. Rouse*, 495 F. Supp. 526, 542 n.7 (E.D. Pa. 1980) (stating that registration was *prima facie* evidence of ownership,

but the registration was invalid because the registrant was not the owner of the mark); *cf. Chien Ming Huang v. Tzu Wei Chen Food Co.*, 849 F.2d 1458, 7 USPQ2d 1335, 1336 (Fed. Cir. 1988) (where applicant "was not the owner of the trademark at the filing or at any time during pendency of the application," application was void); s*ee generally* Pamela S. Chestek, Who owns the mark? A Single Framework for Resolving Trademark Ownership Disputes, 96 Trademark Rep. 681 (2006); J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, §§ 29:8, 16:46, 16:48 (4th ed. 2015)

Using the above factual framework to decide the present dispute, we find that Petitioner is the owner of the mark UVF861. Even if we were persuaded by Respondent's manufacturer/distributor argument, the legal presumption of ownership in Respondent as the manufacturer is rebutted by the evidence of record. When considering the above factors, every one of them favors Petitioner as the owner of the mark (except factor 5, which is neutral because the record does not include evidence on who paid for advertising).

The testimony and evidence establish that Petitioner designed the bulbs used for its ultraviolet counterfeit currency detection equipment, and conceived the mark UVF861 under which the bulbs are sold. Further, Petitioner contracted, albeit not in a written document, with Respondent to manufacture the bulbs under the mark according to Petitioner's specifications so that they would be compatible with Petitioner's equipment. There is no dispute that Petitioner devised the ultraviolet counterfeit currency detection equipment for which the bulbs are used. Moreover,

Petitioner developed the original bulb sold under the mark UVF461; in point of fact, Petitioner came into the relationship with Respondent with the mark UVF461 already in use. When looking to increase wattage with its next generation of bulbs for its ultraviolet counterfeit currency detection equipment, Petitioner developed the successor bulb for its devices. It is only logical and reasonable that the decision to market the bulbs under the mark UVF861 was based on Petitioner's ownership of the mark UVF461 for the smaller wattage bulbs, and its view that it was the owner of the mark UVF861 for the larger wattage bulbs. It was Petitioner, not Respondent, who controlled technical changes to the bulbs. As Ms. Chen indicated, Respondent never sold a bulb under the mark UVF861 prior to its business relationship with Petitioner.

Our finding that Petitioner is the trademark owner and Respondent acquired no ownership interest by way of their business relationship is supported by other cases in which, under similar circumstances, courts have held the dealer, not the manufacturer, to be the owner of the trademark. *See, e.g., Premier Dental Prods. Co. v. Darby Dental Supply Co., Inc.*, 794 F.2d 850, 230 USPQ 233, 236 (3rd Cir. 1986), *cert. denied*, 479 U.S. 950 (1986). ("The decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it."). For example, when a dealer buys goods from a manufacturer and applies or has someone else apply the dealer's own "merchant's mark" to the goods, the dealer, not the manufacturer, is the owner of the trademark. *See, e.g., E.F. Prichard Co. v. Consumers Brewing Co.*, 136 F.2d 512, 58 USPQ 362 (6th Cir.

1943) (EFPC partnership created a trademark and had defendant CBC brew beer and attach the label to beer which the partnership then sold: the partnership was held to be the owner of the mark.); *IMAF, S.P.A. v. J.C. Penney Co.*, 806 F. Supp. 449 (S.D.N.Y. 1992) (Retailer J.C. Penney approached a clothing manufacturer with an order to make sweaters to be sold in Penney outlets, with Penney responsible for quality; Penney found to own the trademark even though the manufacturer suggested the name.); *In re Supply Guys, Inc.*, 86 USPQ2d 1488, 1494 (TTAB 2008) (in some instances a distributor, not the manufacturer, may own the mark used on the goods).

Before its association with Respondent ever commenced, Petitioner sold its ultraviolet counterfeit currency detection equipment, as well as its UVF-461 bulbs for this equipment. At the time Petitioner contacted Respondent, Respondent was selling the same or similar type bulbs under the designation F4T5BLB, which according to Petitioner is a generic designation for this type of bulb. There is no evidence that Petitioner ever transferred any rights in the mark UVF861 to Respondent.

The most telling events bearing on ownership of the mark UVF861 occurred in 2007 when Petitioner grew dissatisfied with the quality of bulbs being produced by Respondent. As a result, Petitioner transferred production of the bulbs from Respondent to Li-Tek Corporation. These bulbs were still branded with the mark UVF861. During the one year that Li-Tek Corporation manufactured the UVF861 bulbs for Petitioner, Respondent was aware of this production, yet Respondent

21

never indicated that it owned the mark or otherwise voiced any objection or infringement concerns to Petitioner based on alleged rights in the mark. The record also is devoid of any evidence indicating that Respondent on its own continued production of UVF861 bulbs during this time.

We find the circumstances herein are similar to those in *Country Fare LLC v. Lucerne Farms*, 102 USPQ2d 1311, 1317 (D. Conn. 2011). In that case, plaintiff CFL created the product and its mark and specified product characteristics, and then contracted with defendant LF to make and sell the product. After a break-down in the relationship, CFL contracted with a third company to make and sell the same product under the same mark. The court found that the nature of their relationship made it clear that CFL was the owner of the mark.

Further, after Petitioner's and Respondent's temporary rapprochement, when quality problems later arose with respect to the bulbs, customers approached Petitioner, rather than Respondent, for a fix. That is, the consuming public believed Petitioner was the party standing behind the UVF861 bulbs, and Petitioner was the party to which they directed complaints about the quality of the bulbs. This comes as no surprise given the "Product Information" literature (dated March, 2007) that Petitioner placed into the box in which its equipment was sold to customers. (Trundy dep., Ex. 6; 8 TTABVUE 69-71). The literature indicates that Petitioner is a manufacturer of fraud prevention equipment, with its equipment being used by the Secret Service at the White House, and that Petitioner's equipment features "brighter bulbs." The literature includes an Order Form for "Replacement Bulb

UVF-861" for the equipment. In response to the consumer complaints, it was Petitioner rather than Respondent that took the initiative to address them. Respondent sought only additional funds from Petitioner after the complaints arose.

Petitioner has shown that it adopted the mark UVF861 at least as early as 2003 when it arranged for the production of bulbs by Respondent. There is no evidence that Petitioner ever agreed that Respondent would own the mark in the United States or that Petitioner ever assigned its rights in the mark to Respondent. Further, there is no evidence that Petitioner authorized Respondent to file the underlying application to register the mark UVF861. In addition, there is no evidence that Respondent was authorized to file applications for marks for any of the other products manufactured by Respondent for Petitioner; on the contrary, Petitioner was the owner of the marks for these products and Respondent did not claim ownership of any of these other marks, notwithstanding that it manufactured the products. At no time prior to the parties' relationship did Respondent manufacture similar products or use the mark UVF861 in connection with any products.

The sale of goods under a trademark does not require that the goods on which the mark is used be manufactured by the seller for the seller to be the owner of the mark. It is enough that the goods are manufactured for it, that it controls their production, or that the goods pass through its hands in the course of trade and that it gives to the goods the benefit of its reputation or of its name and business style. *Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc.*, 154 F. Supp. 2d 586 (S.D.N.Y. 2001);

*Victor Tool & Machine Corp. v. Sun Control Awnings, Inc.*, 299 F. Supp. 868, 874, 162 USPQ 389 (E.D. Mich. 1968), *aff'd*, 411 F.2d 792, 162 USPQ 387 (6th Cir. 1969). This Board has recognized that a merchant can be the owner of a trademark "if he applies or has someone in his behalf apply his own trademark to goods to which he has acquired ownership and title and sells or merely transports such goods in commerce." *Standard Pressed Steel Co. v. Midwest Chrome Process Co.*, 183 USPQ 758 (TTAB 1974). *See In re Expo '74*, 189 USPQ 48 (TTAB 1975); *In re Los Angeles Police Revolver and Athletic Club, Inc.*, 69 USPQ2d 1630 (TTAB 2003) ("[T]he mere fact that the applicant is the distributor of goods is not necessarily fatal to its claim of ownership of the mark."). Thus, Petitioner's claim of ownership is not only consistent with applicable precedent – it is amply supported by the record.

Based on the record, we conclude that, as between Petitioner's and Respondent's competing claims to own the mark UVF861 for light bulbs that is the subject of the registration, Petitioner is the owner.

**Decision:** The petition for cancellation is granted.  Registration No. 4252740 will be cancelled in due course.